Let's see. Make sure I have the counsel straight here. This is Russo and Hanley in this case, am I correct? Russo and Hanley on Jack Russo. Russo. And then we'll have Mr. Hale and Ms. Russo in the second. Trusso? Trusso. Very good. Very well. Mr. Russo. That was it, wasn't it? Was it not? Russo? Very good. Thank you, Your Honor. May it please the Court? My name is Jack Russo. I'm proud to be here before you today for the patent in the underlying action to support Judge Breyer. My intent is to take about 12 minutes of your time and reserve a brief rebuttal. The briefs are thorough. I'm not going to repeat them. I hope to cover three key questions specifically that require reversal here. But before I do that, I want to make one remark, which is this district judge in this case is not bad, he's not lazy, he's certainly not incompetent. I want to make clear that this good, hardworking, smart, even to some degree very savvy, as I can explain, if you're interested, district judge was simply misled and misinformed by defense arguments that oversimplified the 813 into simply an exposure and alignment system, which I'll refer to as a brief to as an EAS system or just EAS because it's a long string of words, that simply incorporated a pattern recognition system, and that was the invention, PRS. I'll use that to make that simpler. And the good news here is the district court specifically said that. It's nothing hidden in the opinion. He extracted this invention to what is in the prior art. I would like three issues to be the focus of this, Your Honor. The first is whether the district court can interpret, we say really reinterpret this pattern here, the 813, so broadly as to reach certain prior art, here's secret, here's secret art, and then use that secret art, which as you know we contend is not even prior art, to find the patent invalid. Second, whether a district court can do so without a trial, without live testimony, without a hearing, hearing in the sense of witnesses, without any credibility assessments, without giving a sworn evidence, at least six witnesses, actually more, submitted by the patentee, any substantial weight at all, in fact zero weight in the case of our expert witnesses, Dr. Rustami and Professor Oldham. Three, whether factual findings on multiple contested tribal issues were, in any event, clearly erroneous given the testimony of Professor Oldham, Dr. Rustami, Mr. Markel, and a host of IBM witnesses. As Your Honor has known, I won't repeat it, the first question is one of law, it's reviewed de novo, there's no question about that, the second one is a mixed question of law and fact, we think on this record, you have to review that nearly de novo, and the third question is clearly one that you look at what the district judge did and have to decide whether it's clearly erroneous. There's no issue of the standard review, the interesting part of this case when I get to the end of the argument will be this, Your Honors have to fix what we think is clearly erroneous Markman interpretations in light of your Phillips ruling, and you have to fix, we think, law that needs to be harmonized on secret art, and I'll make some policy arguments about that as I get through the record here. Mr. Russo, and I think this probably leads into your first argument, so we'll get it going with this question, in claim one, the pattern recognition system limitation, now why, based on the disclosure of the, this is starting at column six, lines 46 and so forth, you're familiar with that, the disclosure that the pattern recognition system in the preferred embodiment comprises the Cognex 1500 system, why should we not understand pattern recognition system to constitute the Cognex 1500? There's absolutely nothing wrong with doing that, we don't contest that, Your Honor, our point is simply this, it's like a personal computer, you're sitting in front of it, it turns on, you can't do any word processing unless you write some application software, it's a development platform, you have to develop something, you have to do something with it, the invention in this case is to do something with that system, is to take that system and create something that was against the trend of the art, the trend of the art, and I take 30 seconds to explain this without repeating the briefs, you have a beautiful courtroom here, there's even a more beautiful courtroom on the second floor, if you look at the patterns that are on this courthouse, there's three patterns clearly of panels on each side, there's also three curtains drop down, as temperature change, winds change, the HPA system changes, those curtains may change, well, the art was the patterns have to be fixed, predetermined panels, when you have those three panels on each side, it's very easy to find and locate that predetermined fixed pattern in which to do alignment, but the interesting part is, if you want to do alignment on those curtains, as those curtains change, as your Honours walk in and out, those curtains slightly shift, if you need something that actually reaches and examines that, you have to program that, you can't just take a Cognex and throw it in a computer and put it in a system and say, voila, we're done, system done, that's essentially what the judge did, he said, even as against prior records said, you have to have fixed identifiable marks, predetermined, we came up with something that broke that tradition, we said, we'll even take those curtains, I use that by analogy, obviously it's not curtains, it's design features, the very first page of the patent says that, the very abstract of the patent says, you can have marks that are obliterated, you can have marks that are missing, you can have marks that have changed because of heat and temperature, we do all that, we program all that, we make the system do that, Cognex alone does not do that, Your Honour. When you say Cognex alone does not do that, the pattern recognition function of Cognex is capable of doing, I take it, everything that's recited in the pattern recognition system limitation, correct? It's capable of being the platform for accepting the programming code, just like this PC is capable of being a spreadsheet calculator, it's capable of being a search engine, it's capable in the sense that you have to bring something to it, it doesn't automatically inherently under the Toro case in your line of authority are inherently, and that's effectively what this judge did, the judge said, you know what, you have a Cognex system, that's it,  In the written description of the patent, where would I look to see the description of those portions of the invention that enhance the capacity of the Cognex? Your Honour, you can start right with the abstract, the last sentence of the abstract, any arbitrary feature on the reticulum substrate, including device features. Right, that's the outcome, but where do I find the place where you explain how it is that you achieve that outcome? I mean, anybody can claim an outcome, but the question is, where do you tell us how to get there with the Cognex? In other words, what's new about your pattern recognition system that wasn't available in an off-the-shelf Cognex? What was new about our system is that we solved the very problem using the Cognex system. You're asking me, does the patent have a disclosure of the exact program code we implemented the invention in? Well, something that would tell someone that didn't otherwise, that wasn't obvious to somebody that picked up a Cognex, that is an advance in the pattern recognition system. There's two flow charts, both Figures 8 and A61, as well as Figure 11, A64. I want to make a point, since we're passing on Figure 8. Remember, we challenge the definition that the Court gave to user and what the defense continues to use, that a user is some abstract corporation, not a human being. You know that we challenge that. The most ridiculous part of this case we submit, Your Honor, and the most ridiculous part of the defense arguments in this case are when you look at Figure 8, it says, has user aborted or has the search area exceeded the maximum? That's the flow chart that lays out the way in which code is going to be written to implement the Cognex unit. Let me just say this, Your Honor. We don't have an enablement issue on appeal here. Nothing's been raised. It's not before you. It's not in the case below. I understand that, but it's always helpful in trying to determine whether a claim limitation encompasses certain aspects to see whether, in fact, those aspects are enabled in the written description. Because if they're not, it certainly makes it harder for us to conclude that a particular limitation does encompass those features. I understand and accept what Your Honor is saying. And let me just finish the points that you've heard about user and the point they're making about their briefing and the point that I think I'm anticipating about their arguments. The flow chart on user is definitely talking about a human. Page 861 in the back of our opening brief has user aborted the search area. The user is a human being. Now, the part of their brief that I think is the most fallacious part of the brief, and reading it four or five times to see if I can come up with any argument to counter this point that I'm about to make, there's none. If you look at page 18 of their brief, the red brief, their opposition brief, they say, and it's attached to footnote 6, a statement that the user can abort a search after several unsuccessful attempts to find the alignment mark does not mean the user is a human. And then they drop footnote 6 and they say the system could be programmed to stop the alignment process after a set number of attempts without human intervention. What's wrong with that, Your Honor? What they're saying to us is even plain as day, we have a flow chart that says the user is a human. And even plain as day, when you look at the actual patent itself, it mentions specifically that the human is an operator. And even as plain as day, and this is the point, Your Honor, it was before the district court, and I'll tell you, when you reread this appendix, when you reread all of the IBM RFQ documents, all of their responses, all that secret confidential stuff, which even in this courthouse still, to this day, they assert certain things have to be blocked out of the brief, certain things have to be blocked out of this appendix from the public view because there's still trade secret agreements between IBM and Tamarack. They're still taking that position today. The mention of user as the operator by one of the skilled artisans that would interpret this very patent. My point about user and the marking rule that's so wrong, particularly in Post Phillips, is user must be a human. User can't be an abstract corporation. You can't take the position in this case that user selectable means simply that IBM gets before the system is finally done, before really concept approval, which is really what has to happen before any of these secret RFQ documents actually result in an offer of sale, there's still concept approval that hadn't occurred, which the district court ignored, which we pointed out to them. At the end of the day, the point that I'm making is user and user selectable are not some corporation getting with a contractor and saying, I want those fixed marks, those fixed panel boards. That's what I want. That's what the district judge said. The problem with that, Your Honor, is when you look at the file history, that's merely a repeat of Kurosawa and Linger, the exact citations that were distinguished by us in the prosecution history. It's just a repeat of that, Your Honor. So what we have here is user, user selectable, and here's the sort of point that just becomes inescapable. We say in our patent that the learning must be by said patent recognition system in the device. We put it integrated in our EAS system. We put it on board. That's not the prior art. That's not even what's in their secret arm. So, in effect, what they convinced the district court to do is to take a step back and abstract this invention into one that said, this is simply a cognate unit inside of an EAS. How would you describe the term learned in the patent? How would you describe it? I think we defined it in our brief, Your Honor. I don't want to misspeak because I know I could be criticized for it, but learning is more than programming or reprogramming. Learning is a series of steps that have to be programmed as part of the cognate unit where there's scanning of an image, storing of an image, evaluation of an image, and creating on the fly, which the district court refused to accept by the operator. Is that a comparison step then? I don't know if I would call it a comparison step. I think there is in the course of it, in the course of the actual calculations that are done, there are comparisons made. I would say it's along the lines of, if I had to do as a pattern in this courthouse those drapes, I've got to focus in on a piece of that drapery. I've got to make a decision of what the curvature, what the angles are using the equipment and using the software. And then I've got to have that model become part of what is the currently then defined system. The LGL used in the district court and the LGL used here. Your Honors may be familiar, like me, with some of your own typing. There's a spell checker. Sometimes a word that is a valid word comes up, but it's not in the spell checker. I said this to the district court. Years ago you couldn't add the word to the old style spell checkers. You were stuck. Because they didn't allow you to, in effect, make the system learn from what you added to the database. You'd have to write a list of those words and send it back to the manufacturer and say to the manufacturer, here, please add these words. These are valid words for the next revision of the dictionary. But now today, most of the word processing products let you, let the system learn new words. Even words you decide to use, like Russo, my name, Bryson, Lynn, Kajarsa. You can add those words. You can make them part of the dictionary. That's learning, Your Honor. That's not reprogramming. That's what you're doing with the system. The learning aspect of Claim 1 is looking at it from the perspective of a pattern recognition system. Looking at it from the perspective of, one, using a pattern recognition system to learn, to essentially scan, incorporate, do processing on, and create a model at the point of operation. And that's a point that we repeatedly made that the district judge refused to accept. Yet that is what's in the pattern, Your Honor. That's what's there. I want to take the rest of it. But you're looking at the pattern recognition system and what it should be looking for, isn't it? Isn't that the essence of learning? Yes, Your Honor. Maybe it's a poor use of the term learning. Well, learning is—skilled artisans would know what learning is, Your Honor. Skilled artisans would know that. And I want to make a point about skilled artisans. IBM and Tamarack are skilled artisans. They didn't invent this invention, but they are skilled artisans. And the point I want to make about this is the law on secret art needs to be fixed. And this case had a chance to fix it, and the district judge refused. He actually identified the issue. He's very on top of the issue because he sent us a note saying, Footnote 5 in Kavanagh is confusing. Here's my view and our firm's view about what needs to be done, and we think this case is a platform for it. The law is, we think, although the cases are confused about it, to get the 102B bar from a third-party sale, you must put in the public domain what it is that you claim you sold. You can't reserve it as a trade secret. You can't even theoretically straddle it. You have to actually put it in the public domain. As Judge Michel said, if a thief steals an invention from an inventor and then sells it to a buyer, and the buyer sells it to a bona fide purchaser, it's in the public domain. He did that in the special devices cases. If you look at these cases, they don't make any sense. They seem to say an exception exists if a process isn't published because it's still secret and it's not in the public domain, so therefore process or method claims can't really be put in the public domain by third parties, but apparatus claims can't. We think that's hogwash. We think what you need to do is write from a clean slate that says, if you're a third party and you want to put some in the public domain, you either defensively publish, which is what should happen, or what you do is you sell without any trade secret restrictions that result in there not being in the public domain. Okay, I think we'd better move on. We have that point, I think, in mind. We'll give you a couple of minutes on rebuttal. You've exceeded your time, but we'll restore two minutes. Thank you, Your Honor. Thank you for giving me the time. Thank you, Mr. Russo. Now, let's see. Again, did I get the pronunciation Mr. Hanley? Mr. Hanley is correct, Your Honor. Okay, very well. May it please the Court. I'd like to start from the very first question that Your Honor raised, which is where in the patent is an explanation of how to achieve the special capability of cognates that's being argued by Ultratech? And the answer is it's nowhere. There is no description in the patent specification of this ability to learn, store patterns by the operators and micro-operations. What about the flow charts that Mr. Russo mentioned? Those flow charts would apply to cognate systems as it was used by Tamarack and IBM with the Pryor systems. Those very same flow charts would apply to Pryor. So I'd like to start, although the emphasis I think in the case is on plant construction, I would like to start with the facts or highlight the facts. I certainly won't recite them because I think the reason the focus is on plant construction is because the facts regarding the offer for sale are undisputed. Those facts are that Tamarack offered for sale before the critical date the same pattern recognition system as claimed in the 813 patent and identified as a perverted body for the same type of exposure and alignment system for the exact same purpose. Ultratech's own expert testified that the fact that such a commercially available system is capable of learning and using arbitrary patterns is the very point for choosing cognates. So I couldn't disagree more with Ultratech's contention that Ultratech's witnesses were disregarded. In fact, that very testimony was relied upon. Mr. Annerley, how would you define learning? We don't believe that a construction of learning was asked for or is necessary. However, if put to the question, which I have been now, I would say it's to acquire and store in such a way that it can be recognized by the pattern recognition system. So it's showing a pattern recognition system for what it would be looking for, the imperative information it would be looking for. That's exactly right. But that could be done, if I understood your definition, with a PROM, with a read-only memory. Well, no, not quite. The situation with the PROM comes up in LINGER, and the distinction there is that Ultratech's argument is that because the PROM in LINGER could be reprogrammed with a new algorithm in order to use a new optical alignment target, which is different than the key target patterns in a cognate pattern recognition system, and because the examiner allowed the patent over LINGER, then learn must mean something more than reprogramming. But the distinction that Ultratech made in the prosecution history is that LINGER is one of these optical alignment target systems, and these systems use a matrix of photodiodes that are hardwired to send electrical signals to a processor. That processor accesses an algorithm which is stored in the PROM, and the algorithm is specific to the particular optical alignment target. So because the number and configuration of the photodiodes is specific to the specific optical alignment target being used, LINGER requires an actual reprogramming of a new search algorithm. Isn't that really just a difference in the degree of difficulty of reprogramming? You're going to be doing some programming one way or another, if I understand your definition of learning, and using the PROM just requires you to do more work, slower, more cumbersome, but you can achieve the same end, right? And it's also basically, you're reprogramming, you're writing code, whereas in the McLean invention, what you have is you have a fixed search algorithm. You never have to reprogram that cognitive search algorithm. All you have to do is take a floppy with a bitmap of a new target, plop it in the machine, and it is learned and stored. So it's a major distinction between the hardwired systems of Curaçao and LINGER, and the Cognex system, which all you needed to do is take a bitmap on a floppy, put it in the system, and that pattern was learned and stored, and could be recognized simply by the fact of putting it into the system. So we believe it's not disputed that Cognex meets the learning and storing limitations of PET. Now, there are several other claim construction issues, but all of them come back to this argument of operator at the time of operation. And as I said at the beginning, that position is simply not supported in the specification. So let's talk about those terms. User-selectable is the first term that is being disputed by Ultratech. This is a pretty straightforward example of attempting to read limitations into a claim to avoid the priority. The term user is a broad term. It could be a person, it could be an entity, it could be a system designer, it could be a process engineer, it could be the ultimate user on the line. So it's a broad term, and it's not limited temporally, and it's not limited functionally. And that's exactly what Ultratech is trying to do, is to read those functional and temporal limitations into the claim. These limitations are not supported by the plain language of the patent. They're not supported by the specification. In fact, we took Ultratech's expert through the specification, line by line, and there was no support found for this operator at the time of operation argument. And it's not supported by the prosecution history, so you have no support for reading those limitations into the term user-selectable. Not even figure 8? I would say no, because figure 8, I guess, a couple of things. This would be an example of reading a limitation from the specification into the claim. Even at that, you have to take a narrow reading of user. I would agree that the most logical use of user, as in figure 8, is a human. However, a machine could also abort the search if the patent is not recognized. So, but anyway, the touchstone is the language. The claim is not limited. Would the Conex system do that? The hardwired Conex system, would that abort the search if the patent was not recognized? It would. It would. It would repeatedly go through the steps, and if the patent was not recognized, it would abort the search. Or, alternatively, the operator could abort the search as well. So either way, it's in the prior art. So the term arbitrary was also claimed to have been misconstrued by the court. One of the keys of the statement in the specification that says, alternative embodiments, any number of known alignment keys or any convenient pattern may be used. There was no real dispute about this term at the time of claim construction or at the time when Ultratech was claiming infringement. In fact, Ultratech relied upon Tamrac's 18 pre-specified fiducials as evidence of arbitrary and user-selectable patents. So when they're claiming infringement, they're relying on pre-specified fiducials. Now they want to argue that arbitrary is something different than pre-specified. That's for validity purposes. Exactly. So the attempt to read the limitation into the claims only comes up when you get to invalidity, and now they want to say that arbitrary means any shape at any location. And really, this is just a backdoor argument to get right back to operator at the time of operation. The argument is that the invention claims training on a new pattern anywhere on the substrate during the alignment process. Well, the fallacy of this argument is that an alignment system is required to know the position and orientation of the pattern on the substrate in order to do alignment. It has to be in relation to the center of the substrate or some other fixed point in the substrate. So without that information, without knowing where a pattern on the substrate is in relation to that fixed point, the system wouldn't know how to align. So the notion that the operator would go in and see a missing or obscure target pattern on there, and so the system wouldn't align with that or wouldn't recognize it, and then you'd go to some other pattern at random on the substrate. Well, guess what? You don't know where that arbitrary or random pattern is in relation to the center point or some other fixed point because that hasn't been programmed into the system. That's the term recipe that's used in, you'll see it used in the request, the IDM request for a quote. You need the recipe, in other words, the relationship between the pattern to be recognized and the center point or some other fixed point on the substrate in order to do the alignment. But what about that on column four of the patent, A68, there's a statement in there that although the alignment is performed on line 14 of column four, although the alignment is performed by moving the substrate while the reticle remains fixed, it will also be understood that the alignment could be performed by moving the reticle by moving both the reticle and the substrate. So that's still a movable alignment, isn't it? That could be manual alignment. So the other interesting point about the argument operate at the time of operation is that in moving, if you've got a missing or obscured pattern and you move the system, move the focus of the system to a new pattern, well, you've got to, with your eyes, manually try and align the crosshairs of the cursor on that new pattern. Well, manually, because you're not using a very precise algorithm, your alignment is only going to be as good as your ability to try and eyeball the center of that path. So if you're in this world where you're basically talking manual alignment, again, either way, Cognex allowed manual alignment, and that's specifically called out in the Tamarack offer for sale. So I believe we've covered... Which brings me to a point about the offer for sale. The IBM RFQ was for a scanning exposure tool. I'm sorry. The IBM RFQ was a request for a laser ablation tool, and your offer was for a scanning exposure tool. Were they one and the same? For purposes of the use of Cognex pattern recognition to learn and store arbitrary user selectable patterns, they're precisely the same. The only difference is that the laser ablation tool uses a laser to etch the surface of a substrate, whereas a scanning exposure tool uses a UV lamp in order to expose photosensitive material on the surface of the substrate. Because there's some kind of irradiation that comes up. Correct. And you've got photosensitive material there on the substrate. Is that the only difference between the two then? It's the only difference in terms of the use of the pattern recognition system, which is at issue here. In other words, as far as using Cognex to learn and store an arbitrary user selectable pattern to align, it's precisely the same. So two more points on the arbitrary limitation, and that is the court's claim of instruction of arbitrary is supported by the prosecution history. You've got two adventure declarations from Mr. Markle. The first refers to arbitrary patterns as, among other things, crosses, circles, squares, and Mr. Markle admitted that these were all known alignment patterns. And in the second declaration, Mr. Markle defined arbitrary to include, among other things again, the vast majority of Chinese characters. Well, that's interesting because by saying the vast majority, he's excluding all. Therefore, on its own, that declaration, Mr. Markle basically defeats Ultratech's proposed plan of construction of any shape because it can't recognize all Chinese characters. I believe we've covered the construction of learn and that... Well, when you say can't recognize all, I mean, is that a function of the fact that some of them more simply have strokes that are so close together or whatever that they don't make suitable subjects for use? I honestly can't tell you the basis for Mr. Markle's statement that it could recognize some but not all, but regardless of what the reason is, and I don't want to avoid your question, I just don't know your answer. Okay, all right. Well, that's all right. But regardless, it can't recognize any shape, which is the argument raised by Ultratech. As to the secret art... There will be some shapes in the nature of things that are just insufficiently distinctive, I would think, that a system of a certain level of sensitivity simply wouldn't be able confidently to make use of that particular shape. I would believe that would be true. It would depend on the level of resolution. Yeah, sure. I mean, you will be selecting shapes in part because of their utility as very reliable indicators to a very high degree of specificity and accuracy of location. Some things won't be suitable for that, I would think. And that's the entire point. That's why this notion that the time of operation to come up with some random reference point on the substrate to align is a fallacy. It's not reality. There's no reason to do it because you need to align based on known targets so you can do the alignment. Well, but I think there's something in the middle area between known targets and all possible conceivable targets, some of which would not be useful. I mean, one could come up with a target that would be perfectly suitable even though it was not previously known. And Cognex allowed you to do that, Your Honor. Cognex, all right. I wanted to address the Secret R. Well, we gave Mr. Russo a couple of extra minutes. Why don't you take – we'll give you – in fact, I think total, we've given him a total of four extra, so we will give you the equivalent amount if you need it. I appreciate that, Your Honor. So with respect to the Secret R, obviously the cases support our position. That's why Ultratech is arguing that there should be some new law made on that. And I think the argument was interesting. Ultratech would impose a requirement that a seller of a product basically somehow announced that sale to the world. And to impose such a requirement would be completely contrary to all commercial reality. And so it just doesn't – it would be an impractical decision. So the decision, as recognized in the LaPorte case, was that the purchaser, as a member of the public, is what makes it a sale that falls out of any kind of Secret R exception. So – Mr. Russo, go ahead, please. While you're on that subject, I couldn't find in the record the nondisclosure agreement. Do we need to take a look at that nondisclosure agreement in order to make a determination about whether or not there was secret information that was distributed? I presume that the nondisclosure agreement with IBM limited the disclosure of their technology. That's right. I don't believe you do need to see the NDA in here's why. It's because under the LaPorte case, the purchaser, as a member of the public, just like IBM is a member of the public, is what basically creates the 102B sale. So regardless of whether it's an NDA or not, you're now selling it to a third party. So you're outside of just Tamarack experimenting with its own system in such a way that it keeps it secret. Once it sells it to IBM, that's a public sale for purposes of 102B. Well, hypothetically, if IBM said, We don't want you to disclose it to anyone. We want to keep this within our own company. Is that still a public sale? It is. Even though it's not available to any third party? It is under the law as it stands. Go ahead, please. Go ahead. Addressing the policy question underlying this form of anticipation, why do you think that rather than simply saying, Well, this is the way the cases line up, can you address Judge Gaiars' question from the perspective of what policy should we be seeking to promote here? Well, I think the policy is that it's impossible to police every single sale out there and for an applicant to know of every single sale out there. But it's a policy not to have sale inventions. So to have where there's a sale that puts an invention in the public domain by whatever definition exists, then you want the patent to be sought promptly within a certain period of time. Well, the key is the word public domain, isn't it? I mean, if there's a sale between, let's say, which is denominated a sale, but it's between two entities of the same company and they list it as a sale because they have an accounting system that does that, that probably wouldn't count, would it? Well, there's a lot better argument in that situation than there is here. It's because the companies are under the same umbrella. There's an argument that's trying to keep it in-house and not go to the outside. Right, but I'm trying to get at the policy argument as to why there's some difference between this kind of sale and the kind of sale in which a secret sale between one entity, one sub of a company and another sub of the same company would not count, if you think it wouldn't count. I think that's an open question, perhaps, but the sale to a third party is a sale to a third party. That's indisputably true, but how does it help answer our question? I guess it helps in that there's never been an intimation that once you sell outside of your company to a third party, there's never been any kind of finding that we're aware of in the cases that say that this is not a public sale. I guess two other points with respect to the secret art issue is that, in fact, IBM did not keep these systems secret. The evidence in the record shows that IBM allowed other companies to come in and look at the exposure alignment systems using Cognite, which were purportedly covered, which were prior art to these systems. Very well, thank you. I'm sorry, did you have another question? Go ahead. I do. With respect to the confidentiality, Mr. Hanlon, I guess both parties would expect us to write an opinion, hopefully, in this case. I draw your attention to page 4 of the red brief. There's a mark there showing confidential material is highlighted. Could you take a look at that? You're referring to the statement? The statement, which is highlighted. Thus, as admitted? Yes. Is that confidential? That was testimony that I believe was marked as confidential by Ultratech in the case. It was testimony of Mr. Markholm. Doesn't that really cover an interpretation of Claim 1? I would see no reason why that should be confidential, but that was designated by Ultratech and we were respecting Ultratech's designation. So how are we supposed to know what is confidential to be put in an opinion and what is not? Well, I believe that if the court has issues with either party's confidentiality designations, the parties can certainly withdraw their designations. Well, this is a very good point to raise, and I'm glad that Judge Gaius did it. And it comes up a lot in these cases where there are often quite expansive claims of confidentiality often made in the district court and simply continued into the Court of Appeals without a lot of additional thought being given to the consequences for us of having to navigate through a whole raft of claims of confidentiality. This isn't as extreme as some cases, but there's still a lot of confidential material. Now, my question to you and also to Mr. Russo is that is there any core concern of materials that you think that in an opinion we ought to steer clear of that you would like to specifically identify or are you prepared to say that anything we would say that we would draw from the materials, even whether they're more confidential or not in this case, you'd have no objection to seeing some such thing appear in an opinion? Our concern, Tamarack's concern regarding confidentiality, was the materials of IBM and of Cognex. And I believe as a matter of convenience, IBM and Cognex designated what they produced in the case as confidential, and so we're respecting that request. It's old. We're talking maybe 15, 16 years old, so whether there's a real reason to maintain that confidentiality, I would question, however— But you're not in a position, what you're telling me, this is third-party material which you've represented that you couldn't really feel comfortable disclosing without permission. I understand. The choice we're left with is to go back to IBM and say, you know, please go through all this stack of documents, and we didn't feel that was appropriate. Well, I guess on the basis of your description, I guess we can probably identify which those are. Okay. Thank you, Mr. Hammer. Thank you. Mr. Russo, before we start into your rebuttal, could you address the same question that we've—that Judge Garris put to Mr. Hanley? I think the principal issue, Your Honor, is IBM takes its confidentiality agreements very seriously. And so IBM, in the course of discovery, said our view is any confidentiality agreement we have with Tamarack is still in play. Well, I guess the specific question I'd like you to focus on is, is there any material as to which you have made a claim of confidentiality that you would not be prepared to waive at this point? As to what Ultratech has asserted as to its own material, we have no problem lifting it. So the same interpretation and remark that Your Honor said, I don't even know why that was marked. I think that was an overabundance of caution on the part of Tamarack. Okay. We have no issue about that. All right. The point I'm making about IBM, and Your Honor asked the question of where is the nondisclosure agreement, I can't point you to the record here because I only brought the appendix with me, but it's clear in the appendix that the IBM witnesses, Mr. Tesler in particular, and Mr. Sheets, the CEO of Tamarack, said, we have multiple nondisclosure agreements. We respect them. We continue to respect them. This entire transaction, even to this day, as counsel said, 15, 16 years later, is still coked in secrecy, and it is absolutely false. Well, okay. I think we have the answer to the procedural question. Why don't we move now to rebuttal so if we can start the time. The substantive one, Your Honor, is it is absolutely false to say that somehow it wasn't really secret. The machines are large machines. They basically would fill this room, and they're operated within a factory or within a manufacturing plant at IBM. Third parties aren't asked to go in and open a box anymore than if there was a stenographic machine there. I could open it up and figure out how a stenographic machine is working or open up this computer to figure out how it's working. IBM was effectively for this transaction, if you read the various request exchanges back and forth, the RFQ documents, they were asking for a co-development relationship. IBM was co-developing software with Tamarack. Concept approval had not even yet occurred. This was my third point I never got to in the opening, but a response to his point. The judge just simply decided to say, as far as I'm concerned, there's a sale here. There's a lot of lip service to it. The judge was hardworking. As I said before, I don't criticize him. He had a lot of information in this case. But there's tribal issues when you have on the face of the document that concept approval is required before we have a transaction, and we have to co-develop software together. To say there's a sale is wrong. What software was being developed? The Cognex software. The Cognex software, and that's the other part of the argument. The second point I want to make, the Cognex software, if you go take a look at the part of the Cognex as a development platform, and this is clearly in the record, if you turn, for example, to the section of the appendix, it's at page A1526 in volume number one of the joint appendix. The Cognex unit itself, Your Honor, describes itself as it's for developers to tailor the vision processor to their particular application. Once the application has been developed, debugged, and tested, the program can be distributed to production configurations. What's going on here? They come into court saying you pop a Cognex into an exposure and alignment system. Indeed, here they say you pop a Cognex into any kind of sending character system, and voila, you're done. False, false, false, false. You're not done. So how much actual inventive work remains to be done to go from the Cognex? Thousands, sometimes thousands of hours of person hours of programming, sometimes hundreds. And it's a very complex and invention-rich process, I take it? It's a process that is invention-rich in the sense, Your Honor, that conceptually you have a team of people. Someone once said that it takes something like 100 person years for Windows operating system to use version of Microsoft stuff to come out. Once you have a concept of an operating system, you can have a team, skill in the art, do the work. It's not as though it's rocket science. And that's the process of going from the basic Cognex to the Cognex with the capacity that's described in your pattern recognition system limitation in your claim. What the notice of allowance allowed, and specifically, and we're proud of it, we're not embarrassed of it. They like to say that, well, it went through four or five rounds with the examiner. The notice of allowance in this case specifically said, I'm allowing this pattern. And, Your Honor, I'm sure you're familiar with it, but the notice of allowance is really where you have to start this case. Well, I guess I have one last question on this line. If there is such a big inventive gap, so to speak, between the basic Cognex and its capacities, and the capacities that are recited in the pattern recognition system limitation in claim one of the patent, where is that inventive process described in the written description other than summarily and conclusorily in figure eight? I wouldn't agree with summarily and conclusorily, Your Honor. Well, okay. Do we look at figure eight and say, aha, that's how you do it? You look at figure eight. As opposed to an announcement that this is an aspiration which you announced that you've achieved. What the testimony was, Your Honor, and this is where the district judge also had it wrong as a matter of law, the Dr. Rostami testimony, Professor Olin's testimony, is you can put a team of programmers on this. You can have them do the work. The work can get done. It'll take a certain amount of time to do it. But the innovation here is the break in the art that's going from fixed, predefined fiducials, predefined marks, to this arbitrary and user-selectable approach that gives much more power to the end user, much more power. And counsel seems to concede that here. Counsel seems to say, yeah, probably the user is a human being. And, in fact, the part that doesn't make any sense is when you read their own documents, their own documents refer to the user as the operator. In other words, skilled artisans would understand the user is the operator. Just like the user can abort, the user can choose. And, indeed, a very function of our invention was allowing the user to choose an arbitrary path, allowing the user to select it, allowing the user to do what wasn't done in the prior art. But isn't the argument that the user, of course, can be a human being, but it's not necessarily limited to a human being? It doesn't make sense, though, otherwise, Ron. It's sort of like the owner of a computer. If I left it here and we had a projection system, I can leave it here, and when I touch the keyboard, I'm a user. That makes total sense. If counsel comes up and uses the machine as well, I may be the owner, but he's still the user. It only makes sense that way. It doesn't make sense to say that it's some corporate owner. Indeed, it only makes sense to talk about it as a human, because the human being is interacting with the piece of equipment. The equipment has a human interface. It has an actual screen, a monitor. They seem to say, well, that's not the way it's done in the industry. That's exactly the tradition that we broke. The tradition we broke is to give the user much more power. That's what they say. Well, that's not what's occurred. Thank you, Mr. Russo. We have to move on. The case is submitted. Thank you, Mr. Kramer. Thank you for the additional time, Your Honor.